IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

ALLSTATE PROPERTY AND                                                           PLAINTIFF
CASUALTY INSURANCE COMPANY

V.                                                                  NO. 4:12-CV-00090-DMB-JMV

JOYCE HUNTER; CAROLYN
WALLACE, as an heir and wrongful
death beneficiary of Y'Lupie Lynetta
Wallace; LARRY WALLACE, as an heir
and wrongful death beneficiary of Y'Lupie
Lynetta Wallace; LARRY WALLACE,
JR., as an heir and wrongful death
beneficiary of Y'Lupie Lynetta Wallace;
and DEROTHA WALLACE, as an heir
and wrongful death beneficiary of Y'Lupie
Lynetta Wallace                                                                 DEFENDANTS

**MEMORANDUM OPINION AND ORDER
DENYING MOTION FOR SUMMARY JUDGMENT**

This is a declaratory judgment action brought by Plaintiff Allstate Property and Casualty Insurance Company against Joyce Hunter and various heirs and wrongful death beneficiaries of Y'Lupie Lynetta Wallace. Before the Court is Allstate's motion for summary judgment. Doc. #39. For the reasons below, the motion is denied.

**I
Motion for Summary Judgment Standard**

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transport A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words,

that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Id*. at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id*. at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

The underlying facts of this case are largely undisputed.[1]

---

[1] The parties, particularly Allstate, heavily rely on hearsay statements in establishing the record. No party has objected to this form of evidence. Accordingly, the Court will consider the proffered evidence for the purpose of deciding the motion for summary judgment. *See BGHA, LLC v. City of Universal City, Tex.*, 340 F.3d 295, 299 (5th Cir. 2003) (in absence of hearsay objections, court did not err in considering hearsay affidavits for purpose of summary judgment).

## A. The Relationship

Y'Lupie Wallace and Joyce Hunter began dating sometime in 2000. Doc. #39-23. When the relationship began, Y'Lupie was approximately fifteen years old and Joyce was approximately twenty-six. *Id*.; Doc. #39-15. Y'Lupie's parents, Carolyn and Larry Wallace, objected to the pairing because they felt that Hunter "was a female predator."[2] Doc. #39-23. Nevertheless, Y'Lupie moved into Joyce's home during her junior year of high school. Doc. #39-5.

During the course of their seven-year partnership, Y'Lupie and Hunter displayed violent tendencies towards each other. Y'Lupie complained that she and Hunter "fought a lot and at times Hunter would choke her." Doc. #39-6. Y'Lupie suffered black eyes from the physical abuse. Docs. #39-6, #39-8. Armando Jarvez Sutton, a friend of the Wallace family, informed police that he had seen Y'Lupie beaten up "numerous times." Doc. #39-5. Sutton also reported that "Hunter told him that she had demons in her and that she believed she could kill anyone and get away with it." *Id*.

Joyce had access to at least one gun and threatened Y'Lupie with the weapon on numerous occasions. *Id*.; Doc. #39-9. Y'Lupie told her uncle, Kendall Gibbs, that "every time [Y'Lupie and Joyce] got into it she (Hunter) pull[ed] the gun on her." Doc. #39-7. Armando Sutton informed police that Y'Lupie expressed concern that "the first thing Hunter would do is get the gun if she found out [Y'Lupie] was leaving [her]." Doc. #39-5. This fear apparently led Y'Lupie, on at least one occasion, to proactively grab the gun during an argument. Doc. #39-23.

Y'Lupie, in turn was the subject of a 2003 criminal investigation for domestic abuse against Hunter. Doc. #41 at Ex. B. During the investigation, a police officer observed "Y'Lupie

---

[2] The parents claim that they took their concerns about Joyce to the police but that "law enforcement officials were unable or unwilling to help." Doc. #39-23.

3

striking the victim Joyce Hunter in the face and head at least 6-8 times." *Id*. On another occasion, a witness was forced to separate Wallace and Y'Lupie during a physical altercation. Doc. #39-8.

On or about Thanksgiving 2006, Carolyn Wallace received a telephone call from Hunter. Doc. #39-23. During the course of the telephone call, Hunter stated that she discovered Y'Lupie "with a male companion" and that Y'Lupie "will never be with anyone else, she belong [sic] to me." *Id*.

In the early spring of 2007, Y'Lupie began telling friends and family that she intended to end her relationship with Hunter. Doc. #39-5; Doc. #39-23.

**B. The Shooting**

In or about April 2007, Larry Wallace, Jr. ("Larry Jr."), Y'Lupie's brother, traveled to Hunter's home "to spend time with [Y'Lupie] due to the fighting between her and Hunter." Doc. #39-10. Larry Jr. intended "to remove Y'Lupie from Hunter's house and relocate [Y'Lupie] in Texas or Atlanta." *Id*. On Sunday, April 22, 2007, Larry Jr. and Y'Lupie spoke "regarding the fighting." *Id*.

On April 23, 2007, Larry Jr. and Y'Lupie went to a mall. *Id*. At approximately 10:00 p.m. that night, Y'Lupie spoke with her sister Derotha Wallace. Doc. #39-9. Y'Lupie told Derotha "that she was getting out of the relationship." *Id*. About two hours later, at 12:00 a.m., Larry Jr. went to sleep in a bedroom "on the opposite end of the house from Y'Lupie's bedroom." Doc. #39-10. Larry Jr. recalls that he awoke in the middle of the night to Hunter "playing with his toes [and] saying 'Your sister thinks I'm a fool.'" *Id*.; Doc. # 39-21. Following this interaction, Larry Jr. returned to sleep. Doc. #39-10.

4

Around 9:20 a.m. on April 24, 2007, Larry Jr. awoke to "someone," later identified as Hunter, kicking down his bedroom door. *Id.*; Doc. #39-12. Hunter yelled that Y'Lupie had been shot. Doc. #39-10.

Hunter and Larry Jr. ran to the bedroom and Larry Jr. observed Y'Lupie "lying on the floor on her left side facing the door." *Id*. Y'Lupie was wearing a white t-shirt that was "ripped and bloody on the back." *Id*. Larry Jr. observed a bullet hole in Y'Lupie's chest which he described as "just a hole with nothing around it. No black circles, no purple circles, just a clean hole. Not a hole like she was shot up close." Doc. #39-22. Larry Jr. also saw clothes and suitcases scattered across the room. Doc. #39-10.

Larry Jr. told Hunter to call 911 "because no one had called," and then ordered her "to help him take her to the hospital." *Id*. Although Y'Lupie was initially conscious, she passed out when Larry Jr. picked her up. *Id*.

Larry Jr. and Hunter put Y'Lupie in Hunter's Dodge Charger, waited for Teresa Hunter (Hunter's sister) to move her car out of the driveway, and then departed for King Daughter's Hospital. Docs. #39-10; #39-12. On the way to the hospital, Hunter's car broke down. Doc. #39-10. After a black SUV stopped and offered to help, Larry Jr. and Hunter moved Y'Lupie into the SUV and proceeded to King Daughter's Hospital and then, upon learning that King Daughter's lacked an emergency room, to Delta Regional Medical Center. *Id*. Y'Lupie was pronounced dead at 9:58 a.m. that morning.[3] Doc. #39-1.

**C. The Investigation**

On the morning of April 24, 2007, Major Percy Miles of the Washington County Sheriff's Department heard a radio report of a shooting at 2615 South Main Extended in

---

[3] Y'Lupie's death certificate lists the time and date of death as 9:58 a.m. on "Apr. 23, 2007." Doc. #39-1. Insofar as it is undisputed that Y'Lupie was shot on April 24, 2007, the date on her death certificate appears to be an error.

5

Greenville. Doc. #39-12. On his way to the scene of the shooting, Miles observed Hunter "speeding down Washington Avenue" in a black SUV. *Id*. Shortly after, Miles saw "Hunter's Dodge Charger at the intersection of Wildwood and Main Ext. and a male was in the car." *Id*.

Miles arrived at the scene with Emma Watts, a crime scene investigator. Doc. #39-12. Miles entered the home and found Sergeant Tommy Flannagan and Teresa Hunter inside. *Id*. In addition to Flannagan and Hunter, Miles saw a mop and "yellow mop bucket" full of reddish water. *Id*. Based on the color of the water, Miles believed that the mop had been used to clean up blood. *Id*.

Miles walked to the bedroom-crime scene and "noticed clothing over the floor, blood on the clothing and … drawer[s] pulled out." Doc. #39-12. After asking Flannagan and Teresa to step out of the room, Miles "began to look around the room for a weapon and to see if anyone else was in the house." *Id.* During this inspection, Miles saw a gun on the floor at the foot of the bed and a black holster on the bed itself. *Id*. Later, Miles found a bullet casing under a pile of clothes. *Id*.

Miles moved from the bedroom to the master bathroom and discovered blood on a cabinet and water still in the tub. *Id*. Based on the presence of water and the disarray of the bedroom, Miles surmised that a "disturbance had occurred" not long after someone exited the tub. *Id*.

After completing his investigation at the home, Miles drove to the hospital where he attempted to question Teresa Hunter, Joyce Hunter (after advising her of her *Miranda* rights), and Larry Jr. Doc. #39-12.

Teresa informed Miles that she was returning from grocery shopping when she observed Larry Jr. and Joyce carrying Y'Lupie to the Charger. *Id*. Teresa explained that Larry Jr. and

6

Joyce told her to get out of the way and sped off.[4] *Id*. Larry Jr. said that he did not hear a shot, but that Joyce kicked down his door and told him of the shooting. *Id*. Joyce refused to sign a *Miranda* card, but allowed Miles to perform a blood swab on her fingers. *Id*.

The same day, Flannagan traveled to Delta Regional Medical Center to question Joyce. Doc. #39-13. When he arrived, Flannagan found Joyce "crying and stating that Y'Lupie shouldn't have gotten the gun" and that "the gun went off." *Id*. After hearing this, Flannagan transported Joyce to the Washington County Sheriff's Office. *Id*. During this process, Joyce, who was still crying, stated "that Y'Lupie got the gun from under the bed during the time that they were arguing about her daughter and school [and that] she and [Y'Lupie] were tusseling over the gun and she … turned the gun away from herself and that is when the gun went off." *Id*. Joyce claimed that, before she died, "Y'Lupie looked at her and told her 'I love you Joyce, goodbye.'" *Id*.

### D. Forensics

Steven T. Hayne, M.D., conducted an autopsy of Y'Lupie. Doc. #39-14. The autopsy listed Y'Lupie's cause of death as a "[g]unshot wound of the chest, close, near-contact and perforating." *Id*. Haynes found powder residue "about the entrance [of the] gunshot wound" and observed that "[t]he angles of trajectory are anterior to posterior, right to left at approximately 5 – 10 degrees, and superior to inferior at approximately 30 – 35 degrees."[5] *Id*.

Additionally, Hayne found: (1) "[a] 1 cm subacute contusion … over the right shin;" (2) "a 3 cm subacute contusion … over the left shin;" (3) "[a] 0.5 cm abrasion … over the left

---

[4] Derotha, Y'Lupie's sister, later told police that Teresa's girlfriend, Henricka, "knows that Teresa cleaned the house of blood before the Sheriff Department could arrive." Doc. #39-9.

[5] In common parlance, this means that, when it was fired, the gun was pointed downward at a 30 – 35 degree angle. *See Parvin v. State*, 113 So.3d 1243, 1248–50 (Miss. 2013) (noting that a 25 – 30 superior to inferior angle corresponds to "25 to 30 degrees downward").

7

cheek;" (4) "a 6 cm contusion … over the right cheek;" (5) "[a] 2 cm abrasion" over the right cheek; (6) "[t]wo contusions … over the mid to distal anterior surface of the right forearm that measure up to 2 cm;" (7) "[c]ontusions over the anterior surface of the right knee and mid right shin that measure up to 3 cm;" (8) "[a] .3 cm abrasion … over the right shin;" and (9) "[a] 0.5 cm laceration … over the dorsal surface of the 5th digit of the right hand." *Id*.

A Mississippi Crime Laboratory report found no evidence of gunshot residue on Larry Jr., Joyce, or Teresa. Doc. #39-16. No fingerprints were recovered from the gun or the shell casing recovered from Joyce's home. Doc. #39-17.

### E. Criminal Proceedings

On April 25, 2007, Miles executed an affidavit in front of a Justice Court judge in Washington County. Doc. #39-18. In his affidavit, Miles averred that, on April 24, 2007, "Joyce Hunter did then and there, unlawfully and feloniously with deliberate design to cause death to a human being by shooting Y[']Lupie Wallace once in the chest." *Id*. Based on this affidavit, the Justice Court judge issued an arrest warrant for Joyce on the charge of murder. Doc. # 39-2. Sometime later, the charges were dismissed.[6]

### F. The Policy

Joyce maintained a property insurance policy on her home through Plaintiff Allstate Property and Casualty Insurance Company ("Policy"). Doc. #39-4. Under the terms of the Policy, Allstate was obligated "to pay damages which an insured person becomes legally obligated to pay because of bodily injury or property damage arising from an occurrence to which this policy applies, and is covered by this part of the policy." Doc. #39-4 at 19. The

---

[6] Neither side has offered an order of dismissal or any other evidence showing a dismissal, much less anything explaining precisely why the charges against Hunter were dismissed.

Policy defined an "occurrence" as "an accident … resulting in bodily injury or property damage." *Id*. at 3 (emphasis omitted).

> Notwithstanding these provisions, the Policy provides that:
>
> We do not cover any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of[] any insured person. This exclusion applies even if:
>
> (a) such insured person lacks the mental capacity to govern his or her conduct;
> (b) such bodily injury or property damage is of a different kind or degree than intended or reasonably expected; or
> (c) such bodily injury or property damage is sustained by a different person than intended or reasonably expected.
>
> This exclusion applies regardless of whether or not such insured person is actually charged with, or convicted of a crime.

*Id*. at 19 (emphasis omitted).

### G. The Civil Actions

On December 21, 2007, Carolyn, Larry, Larry Jr. and Derotha, filed a wrongful death action against Hunter in the Circuit Court of Washington County, Mississippi. Doc. #1 at Ex. B. In the complaint, the Wallaces allege that Hunter caused Y'Lupie's death through "wrongful actions [that] were willful and or grossly negligent." *Id*. In the nearly seven years since the filing of the complaint, neither the Wallaces nor Hunter have filed a dispositive motion, nor has a trial date been set.[7]

On October 1, 2012, Allstate filed the instant action against Hunter and the Wallaces. Doc. #1. In its complaint, Allstate asks the Court to declare: (1) "whether there is any liability insurance coverage under the Policy for the acts of Joyce Hunter and the death of Y'[L]upie Lynetta Wallace, and any alleged resulting damages, and for the [state court] Lawsuit;" (2)

---

[7] The existence of the state court action does not preclude consideration of this declaratory judgment action. *See Agora Syndicate, Inc v. Robinson Janitorial Specialists, Inc.*, 149 F.3d 371, 372–74 (5th Cir. 1998) (notwithstanding state wrongful death action, district court erred in abstaining from declaratory judgment action regarding scope of insurance coverage)

9

"whether Allstate has any duty to defend and/or indemnify Joyce Hunter under or pursuant to the Policy as to or against the claims asserted in the [state court] Lawsuit;" and (3) "whether [the Wallaces] have any recourse … against Allstate as to or under the Policy." Doc. #1 at ¶¶ 38–41.

### III
### Analysis

In its motion for summary judgment, Allstate argues that Joyce intentionally shot Y'Lupie, and that "[t]here is no liability coverage under the Policy which would be applicable to the intentional actions of Joyce Hunter resulting in the death of Y'Lupie Wallace or to the Underlying Lawsuit commenced against Joyce Hunter by [the Wallaces]." Doc. #40 at 14. Allstate further argues that "[i]n addition to the provisions and exclusions of the … Policy, established Mississippi law holds that intentional acts are excluded from coverage under insurance policies, and the insurer has no duty to defend or indemnify for such acts." *Id.* (citing *Lewis v. Allstate Ins. Co.*, 730 So.2d 65 (Miss. 1998); *American States Ins. Co. v. Natchez Steam Laundry*, 131 F.3d 551 (5th Cir. 1998); and *Capital City Ins. Co. v. Hurst*, 632 F.3d 898 (5th Cir. 2011)).

Contrary to Allstate's contention, the cases it cites do not stand for the proposition that Mississippi recognizes an intentional act exclusion beyond the limits set forth in an insurance policy. Indeed, each cited case explicitly relied on the terms of the relevant insurance policy in finding an absence of coverage. *See Hurst*, 632 F.3d at 905 ("[u]nder any reading of the Policy, [a] manslaughter conviction negates any finding that [the] death was an 'accident'"); *Natchez Steam Laundry*, 131 F.3d at 555 ("both policies patently exclude claims for injuries stemming from intentional acts by the insured"); *Lewis*, 730 So.2d at 70 ("intentional act exclusions should be limited to the express terms of the policies"). Accordingly, the sole question presented by Allstate's motion for summary judgment is whether there is a genuine issue of material fact as to

whether the shooting of Y'Lupie was "intentional," as that term is used in the liability exclusion section of the Policy.

As articulated above, the Policy excludes from coverage liability arising from "any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of[] any insured person." Doc. #39-4 at 19. Mississippi courts have interpreted this provision "to preclude coverage for an act 'if the actor desires to cause the consequences of his act, or believes that the consequences are substantially certain to result from it.'" *Allstate Prop. & Cas. Co. v. Pickett*, 5:12-cv-157, 2014 WL 202758, at *2 (S.D. Miss. Jan. 17, 2014) (quoting *Lewis*, 730 So.2d at 68). Under this interpretation, intentional acts, even those arising in self-defense, are excluded from coverage. *Id*.

In arguing that Hunter intended to shoot Joyce, Allstate points to the following facts:

(1) "Joyce unsuccessfully attempted to hide evidence of the intentional nature of the shooting."

(2) "The state of the crime scene indicated that a disturbance had occurred."

(3) "[T]he bullet casing was discovered <u>under</u> clothes on the floor [meaning that] Joyce shot Y'Lupie and then disrobed (throwing her clothes on the casing)."

(4) "Joyce admitted that her hand was on the gun when it discharged, yet there was no gun pow[d]er residue on her hands nor were there fingerprints on the gun."

(5) "[Joyce] attempted to clean up the crime scene with a mop and bucket of water before the police could arrive."

(6) "Joyce and Y'Lupie were the same height. That fact coupled with the downward trajectory of the bullet and the lack of [circles] on the gunshot wound make it impossible that the gun was discharged in a close-quarters 'tussle.'"

11

(7) "According to Joyce, Y'Lupie would never be with anyone else because she belonged to Joyce. Joyce believed that she could kill anyone and 'get away with it.'"

Doc. #40 at 13–14.

In its reply brief, Allstate argues that the Miles affidavit charging Hunter with murder "remains uncontradicted"[8] and that the affidavit, along with "other undisputed evidence …. [i]nescapably leads to the conclusion that Joyce intentionally shot Y'Lupie." Doc. #42 at 1–2.

As an initial matter, Allstate has not sought to qualify Miles as an expert and has failed to submit evidence regarding his qualifications. Accordingly, his opinion that Y'Lupie committed "murder" is merely a lay opinion. *See Snapt Inc. v. Ellipse Commc'ns Inc.*, 430 Fed. App'x 346, 352 (5th Cir. 2011) (affirming district court's striking of expert affidavit where declaration failed "to provide qualifications that demonstrate[d expert's] expertise or the methods by which he reached his conclusion"); *see also Riley v. Ford Motor Co.*, No. 2:09-cv-148, 2011 WL 3236364, at *2 (S.D. Miss. Jul. 27, 2011) ("[E]ven if [witnesses] are not qualified as experts, they can still offer their opinion as a lay witness, if the requisite showing is made to establish the basis of their opinion."). In order for a non-expert to testify to opinions or inferences, such conclusions must be:

> (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. "The burden is on the party wishing to introduce lay opinion testimony to establish the proper foundation." *U.S. v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004); *see also U.S. v. Fernandez-Roque*, 703 F.2d 808, 812 (5th Cir. 1983) (proponent of evidence bears burden of showing admissibility).

---

[8] The Court notes that it is also uncontradicted that the murder charge was dismissed.

Here, while it is undisputed that Miles participated in the investigation, it is impossible to tell whether his conclusion, as offered in the affidavit, was limited to his perceptions or whether he reached the conclusion without reliance on scientific, technical, or other specialized knowledge. Accordingly, Allstate has failed to meet its burden of showing admissibility pursuant to Rule 701, and the Miles affidavit must be deemed inadmissible for purposes of the summary judgment motion. *See Iglinksy v. Player*, No. 08-650, 2010 WL 4925000, at *4 (M.D. La. Jul. 16, 2010) (officer could not testify as a lay witness as to whether a person "was carelessly operating [a] vehicle at the time of … accident").

Additionally, inapposite to Allstate's representation, there is no evidence that Joyce was the person who cleaned the blood up from the crime scene. Indeed, the only evidence on this point suggests that Teresa cleaned up the house. Similarly, Larry Jr.'s observation that there were no circles around the bullet hole is counter-balanced by the autopsy report's finding of powder residue around the wound.

Furthermore, while Allstate has offered circumstantial evidence of intent, record evidence also supports a contrary finding. Joyce, the only person with first-hand knowledge of the actual events, told police that the shooting was an accident which occurred during a physical altercation. The likelihood of this scenario is buttressed by the existence of lacerations and cuts on Y'Lupie's body and the evidence of a disturbance in the room. The remaining physical evidence (the downward trajectory of the bullet and Joyce's washing of her hands and changing of her clothes) does not exclude the possibility of an accident. It is certainly possible that, during a physical altercation, a gun may discharge at a downward angle. Furthermore, it is more probable that, following an accidental shooting of a long-time partner, a person may desire to remove blood-stained clothing and then wash their hands.

13

"[W]here, as here, resolution of the dispositive issue necessitates a determination of one's state of mind, Courts should use great caution in deciding that issue on Summary Judgment …." *Burk v. Thorson, Inc.*, 66 F.Supp.2d 1069, 1074 (D. Minn. 1999) (collecting cases); *see also Pasco v. Knoblauch*, 223 Fed. App'x 319, 322 (5th Cir. 2007) ("[S]ummary judgment is rarely proper when an issue of intent is involved."). This rule carries particular weight where a party seeks to establish intent through circumstantial evidence. *See Sellers v. BNSF Ry. Co.*, No. 1:11-cv-190, 2013 WL 1181458, at *4 (E.D. Tex. Mar. 18, 2013) ("[S]ummary judgment is generally inappropriate where inferences parties seek to draw deal with questions of motive and intent." (internal quotation marks omitted)).

This is a case where the only direct evidence of the shooter's intent could support a finding of an accident and where the circumstantial evidence is inconclusive. Drawing every reasonable inference in favor of the non-moving parties, this Court cannot conclude that there is no genuine issue of material fact as to whether the shooting was intentional. *Compare S. Farm Bureau Cas. Ins. Co. v. Allard*, 611 So.2d 966, 968 (Miss. 1992) (summary judgment inappropriate on intentional act exclusion where shooter "stated he fired the shot in order to bring [attacker] to his senses and that [attacker] stepped forward into the line of fire") *with Thomas v. State Farm Fire and Cas. Co.*, 856 So.2d 646, 649 (Miss. Ct. App. 2003) (granting summary judgment on intentional exclusion where shooter pled guilty to aggravated assault and victim "changed her story regarding the intention of [the shooter] after asking for punitive damages").

## IV
## Conclusion

For the reasons above, the Court concludes that Allstate's motion for summary judgment must be **DENIED**.

SO ORDERED, this the 4th day of September, 2014.

                                        **/s/ Debra M. Brown**
                                        **UNITED STATES DISTRICT JUDGE**